INTER-STATE MILK PRODUCERS' COOPERATIVE, A PENN-
SYLVANIA CO-OPERATIVE CORPORATION, APPELLANT,
v. FLOYD R. HOFFMAN, DIRECTOR, OFFICE OF MILK
INDUSTRY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 6, 1963—Decided May 23, 1963.

Before Judges GOLDMANN, FREUND and FOLEY.

*Mr. A. Evans Kephart,* of the Philadelphia Bar, argued the cause for appellant (*Messrs. Backes & Backes,* attorneys).

*Mr. Donald M. Altman,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General, attorney).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Inter-State Milk Producers' Cooperative (Cooperative) appeals from a determination of the Director of the Office of Milk Industry (Director) that Cooperative is a milk dealer within the meaning of section 1 of the Milk Control Act, *L.* 1941, *c.* 274, as amended; *N. J. S. A.* 4:12A–1 *et seq.,* and therefore should be licensed, as required by section 28 (*N. J. S. A.* 4:12A–28). The matter comes before us on an agreed statement of facts.

I.

Cooperative is a Pennsylvania cooperative corporation, organized in 1936 under the Cooperative Agricultural Association Act of Pennsylvania, 1929 *P. L.* 885, as amended; 14 *Purdon's Pa. Stat. Ann.,* § 81 *et seq.* Cooperative was recognized to be a *bona fide* cooperative under our Agricultural Cooperative Association Act, *L.* 1924, *c.* 12, as amended, and in January 1937 was issued a certificate pursuant to *N. J. S. A.* 4:13–15 authorizing it to transact business in New Jersey. Cooperative is also a producer cooperative corporation approved by the Director under section 31 of the Milk Control Act, *N. J. S. A.* 4:12A–31.

One of Cooperative's principal functions has been and is to appear at price hearings before governmental producer price-fixing agencies, including the Office of Milk Industry of this State; to present evidence in support of a proper producer price—generally in opposition to the position of many milk dealers; and otherwise to act for and on behalf and in place of its producer-stockholders (members). In effect, Coopera-

tive operates as the *alter ego* of all producer-members involved, acting together in their own interest.

From 1937 until October 5, 1962, the date of the Director's letter determination, Cooperative has had several hundred milk producers of Pennsylvania and New Jersey as its stockholders and members, under producer's marketing agreements with it, and has acted as bargaining agent for the disposition of their milk to dealers distributing milk in southern New Jersey. These agreements are referred to hereinafter. During that period most of the New Jersey dealers receiving milk from Cooperative's producer-members paid them directly, after first deducting Cooperative's dues, designated in the producer's marketing agreements as commissions. The dealers sent these dues directly to Cooperative. However, there were a few agreements with dealers whereby they paid Cooperative, rather than the producer, for the milk. In those instances Cooperative, in turn, made payment to the producers after deducting the dues, as provided in the marketing agreements.

On September 1, 1962 Cooperative, as agent for its members, entered into an agreement with Borden-Castanea Dairy of Trenton, N. J. (Dairy), a division of the Borden Company. Dairy agreed to purchase all milk received from producers, unless prior arrangements to divert the milk for Cooperative's account had been made between Dairy and Cooperative; and further agreed to pay Cooperative for any milk so received the prices fixed by applicable Federal Government orders. The producers referred to in the agreement are Cooperative stockholders, some 82 in number, about two-fifths being residents of Pennsylvania and the remainder of New Jersey.

It is stipulated that the purpose of the Cooperative-Dairy agreement was to enable Cooperative, as agent for its members, to collect for the milk Dairy received from them and to pay the money over to the producers. If Dairy did not buy some of the milk of the Pennsylvania producers, Cooperative could sell this milk outside of New Jersey and blend the pro-

ceeds with the amounts it collected from Dairy for the milk of those producers received within New Jersey under Office of Milk Industry pricing. In the latter case Cooperative would pay a blend price to the producers. (See *N. J. S. A.* 4:12A–31 permitting an approved producer cooperative association or corporation to blend the proceeds of all net sales either within or without the State, and to pay the proceeds to its members.) Cooperative does not intend to divert any New Jersey milk for sale to other than those dairies with whom it has long-term contracts similar to Dairy's. At such time as it does so divert, Cooperative represents that it will notify the Director so that he may proceed according to law.

All monies received by Cooperative have been and are kept in a separate "agent for members milk" account, and not mingled with regular funds accumulated from dues. Monies due Cooperative members for milk are paid to them in full on a semimonthly basis, as provided by the producer's marketing agreements.

Producer-members deliver their milk at their farms to bulk tank trucks owned by certain haulers. These trucks are not leased, owned or controlled by Cooperative, and the hauling charges are paid through a deduction taken by Dairy and paid by it to the haulers on behalf of the respective producers.

The parties further agree that Cooperative never has possession of or title to the milk received by Dairy under the September 1, 1962 agreement, but acts only as provided by the producer's marketing agreements. Under the regulations of the Office of Milk Industry, Order No. 57–1, as amended, Dairy is deemed to take title to milk received in New Jersey once it is measured, sampled and removed from the New Jersey producer's holding tank into the tank truck serving Dairy.

Prior to September 1, 1962 the Director knew that Cooperative was representing its members at milk control hearings, acting as their bargaining agent and receiving dues (commissions) from them. He did not become aware of the fact that Cooperative was receiving payments for milk and distributing

the proceeds until after that date, when he learned of the Dairy contract and a similar agreement between Cooperative and Abbotts Dairies. There followed a conference with the manager and representatives of Cooperative, who insisted that it was unnecessary for Cooperative to be licensed. The Director reserved decision and, on October 5, 1962, wrote Cooperative that after studying the statute involved he had decided not to reverse "my long-standing interpretation of the Milk Control Act to the effect that all cooperatives marketing milk must be licensed." In so ruling, he relied upon the definition of "milk dealer" in *N. J. S. A.* 4:12A–1, mentioned hereafter.

Cooperative's representatives had indicated at the conference that there would be an appeal if a license were required, and some question was raised as to the necessity of a formal hearing before such action could be taken. In his October 5 letter the Director stated it would be unnecessary to put Cooperative and the State to the expense of a hearing. He agreed that should Cooperative appeal, he would not raise the procedural defenses of ripeness for review, exhaustion of administrative remedies, or any similar defense which would preclude Cooperative from obtaining a decision on the merits.

We note that in his determination of October 5, 1962 the Director failed to make any findings of fact, as required by *N. J. S. A.* 4:12A–20. The agreed statement of facts now presented to us alleges that the Director's determination that Cooperative is a "milk dealer" under *N. J. S. A.* 4:12A–1 was based on the following:

"The Cooperative determines which dairy is to receive each producer's milk; the Cooperative, in some instances, receives payment for the producer's milk; the Director has always held that the event of both such activities occurring together constitutes one a milk dealer. The Director has determined that, under the agreed statement of facts, the Cooperative is 'handling' milk within the meaning of the aforesaid statute [*N. J. S. A.* 4:12A–1]."

The Director's determination, it is said, would require Cooperative to pay an annual fee of about $1,000 for a milk

dealer's license. Dairy, of course, is a milk dealer, and has to pay an annual license fee of the same amount, allegedly on the same milk.

We were informed at oral argument that there are three producer cooperatives operating in this State. The first is a processor of milk and duly licensed. The second is represented as being a purely bargaining group, engaged in lobbying on occasion. The third is plaintiff.

## II.

As Cooperative points out in its brief, a producer cooperative corporation differs from an ordinary business corporation in that the latter does not represent its stockholders individually, while a cooperative represents its members and its primary function is to act for them and on their behalf. That Cooperative does so is not denied.

Agricultural cooperative associations and corporations came into existence after World War I and have had a very rapid growth since. They exist in almost every state. Congress has recognized their utility, and by general acceptance cooperative marketing statutes are considered as promoting the common interest. *Liberty Warehouse Co. v. Burley Tobacco Growers Coop. Marketing Ass'n,* 276 *U. S.* 71, 92–93, 96, 48 *S. Ct.* 291, 72 *L. Ed.* 473 (1928). Our Agricultural Cooperative Associations Act, *N. J. S. A.* 4:13–1 *et seq.,* dates back to 1924, evincing a policy to aid and protect producers of agricultural products (milk is such a product, *N. J. S. A.* 4:13–1), and to encourage cooperative corporations among them. The same is true of the Pennsylvania statute under which Cooperative is incorporated.

The Director relied upon the definition section of the Milk Control Act, *N. J. S. A.* 4:12A–1. That section contains the following definitions:

" 'Milk dealer.' Any person who sells or distributes milk, including on consignment or for the account of a producer, or who purchases milk from producers or other milk dealers, as herein defined,

and who, in addition thereto, pasteurizes in his own plant or bottles in his own plant for sale in this State to consumers or stores or other milk dealers or processors, as herein defined, except for consumption on the premises of the producers. *Any dairy co-operative association organized under any law of this or any other State, as hereinafter defined, is hereby declared to be a milk dealer within the meaning of this act as the director may determine.*

Milk dealers as herein defined, may also purchase and distribute for storage or manufacture within or without this State." (Italics ours)

and

" 'Producer.' Any person producing milk entirely for sale to a milk dealer or processor except for the milk produced for the use of himself and his family and the use of his employees and their families."

Cooperative claims that the concluding italicized words of the "milk dealer" definition—"as the director may determine" —amount to an invalid delegation of legislative power because unaccompanied by sufficient basic standards, citing what was said in this regard in *Van Riper v. Traffic Telephone Workers' Federation of N. J.*, 2 *N. J.* 335, 353 (1949), and *Como Farms, Inc. v. Foran*, 6 *N. J. Super.* 306, 311 (*App. Div.* 1950). The State's brief does not squarely meet this issue, although at oral argument the deputy attorney general admitted that the phrase "as the director may determine" was troublesome. We do not pass on the question because our determination rests on another ground, but something may be said in support of the Director's power. The Supreme Court in *In re Berardi*, 23 *N. J.* 485, 491 (1957), affirming *Berardi v. Rutter*, 42 *N. J. Super.* 39 (*App. Div.* 1956), said that "in ascertaining the presence of standards and norms to support delegated powers, it is fundamental we are not confined to the four corners of the particular section, but are obligated to examine the entire act in the light of its surroundings and objectives, nor need the standards be set forth in express terms if they may be reasonably inferred from the statutory scheme as a whole." Citing *Ward v. Scott*, 11 *N. J.* 117 (1952), and *Schierstead v. Brigantine*, 20 *N. J.* 164 (1955). It is possible

to find sufficient norms in the definition section of the Milk Control Act, *N. J. S. A.* 4:12A–1, read in context of the remainder of the act.

Initially, it is apparent that although the definition of "milk dealer" speaks of the "handling of milk in this State, as hereinafter defined," nowhere did the Legislature define "handling of milk." The State so admits. It may be that the phrase "as hereinafter defined" refers back to the word "milk," which is defined in the same section, *N. J. S. A.* 4:12A–1. Our examination of statutes *in pari materia*—for example, *N. J. S. A.* 4:12–1 *et seq.*—does not provide further enlightenment. By contrast, the Pennsylvania statute, 31 *Purdon's Pa. Stat. Ann.,* § 700J–103, defines "handle" as including, along with buying and selling milk, consigning and also controlling as consignor.

"Handle" is a comprehensive term and has different connotations, varying with the environment in which it appears. *Selective Logging Co. v. General Casualty Co. of America,* 49 *Wash.* 2d 347, 352, 301 *P.* 2d 535, 538 (*Sup. Ct.* 1956). In its primary sense it involves physical touching. However, in its broader and secondary sense it has been defined as "to act toward, or upon, to deal with, or to perform such function with regard to; to carry out, perform, or transact; * * * also to manage, conduct, direct, or control, a thing * * * or a matter." In particular connections "handle" has been defined as "to put into the channels of trade; to take on consignment." See 39 *C. J. S., Handle, page* 770 (1944), and footnotes. *Cf. Black's Law Dictionary, p.* 845 (1951).

Considering what Cooperative actually does on a day-to-day basis for its producer-members, we are compelled to conclude that Cooperative is "engaged in this State in the handling of milk." This is established not only by what appears in the agreed statement of facts, set out in the first section of this opinion, but is made manifest by reference to the provisions of the producer's marketing agreements mentioned in that statement. A copy of the standard agreement is reproduced in the record. It provides, among other things that:

"2. The Producer hereby agrees to consign to the Cooperative, for sale by it or on its order, all milk and cream produced on any farm or by any cows owned or under the control of said Producer, except such milk and cream as said Producer may retain for home consumption. * * *

3. The Producer hereby agrees to deliver said milk and cream at such times and to such places as may be designated from time to time by the Cooperative, or to make delivery of said milk and cream by such haulers or carriers and by the use of such hauling equipment and facilities as are approved or supplied by the Cooperative.

* * * * * * * *

5. The Cooperative agrees to sell and dispose of said milk and cream to such parties by such methods and for such purposes as the Cooperative shall deem to be to the best advantage of the Producer.

6. The Cooperative may blend the proceeds derived from the sale of milk and cream for the Producer with the proceeds derived from the sale of milk and cream of other producers, and may equalize the returns between all producers and, to accomplish such purpose, may establish from time to time such base rating plans and/or such pool or pools as may be necessary. * * *

7. The Cooperative hereby guarantees to the Producer ultimate payment for all milk and/or cream sold by the Producer through the Cooperative, * * *

8. * * * * * * *

The Cooperative may collect direct from the purchaser payment for all milk and/or cream covered by this contract and remit the proceeds thereof to the Producer in accordance with this agreement, or, at the option of the Cooperative, the purchaser of said milk and/or cream may be authorized to pay direct to the Producer all monies due to said Producer * * *."

Cooperative's brief expressly admits that its function is to sell, or direct the sale of, its members' product as agent.

But the matter may not be disposed of so simply. As Cooperative states, it has been and continues to be a composite of all of its producer-members; it does not take possession of or title to milk, but acts only as a producer's marketing agent; it does not bottle, process or sell milk to any consumer. It points out—and the agreed statement of facts corroborates the representation—that as part of its primary function of acting for and on behalf of its producer-members, it appears at price hearings before milk control agencies and assumes a role usually antagonistic to the positions of milk dealers, who ordinarily purchase their milk directly from producers and must

pay for it at producers' prices fixed by the control agency. In short, it is the corporate projection of the producer group.

Our Agricultural Cooperative Associations Act, *N. J. S. A.* 4:13–3(a), specifically provides that an agricultural cooperative may, among other activities pursued on behalf of its members, engage in the "marketing or selling of agricultural products," defined in *N. J. S. A.* 4:13–1 as including dairy products. *R. S.* 4:13–26 permits a cooperative to enter into marketing agreements with any of its members for the purpose of carrying out its objectives, and *R. S.* 4:13–27 authorizes the bylaws to require that members sell all or any part of their specifically enumerated agricultural products exclusively through the cooperative. The Pennsylvania law under which Cooperative is incorporated is to the same effect. See 14 *Purdon's Pa. Stat. Ann.,* §§ 81 and 90.

A reading of the Agricultural Cooperative Associations Act makes clear that the Legislature has lent full encouragement to the promotion and growth of cooperatives. The question remains: Does Cooperative's marketing or selling of its producer-members' milk nonetheless establish it as a milk dealer under the Milk Control Act? Milk control has been the subject of legislative attention since the depression crisis days of 1933, when *L.* 1933, *c.* 169 was adopted. In 1935 the Legislature passed *chapter* 175; the preamble of that act, like the 1933 law, shows a vital concern for milk producers who were being paid less for their milk than the actual cost of production, resulting in discontent throughout the industry, milk strikes, and the lack of a sufficient supply of fresh wholesome milk. In view of the fact that the 1933 act would soon expire by its own limitations, the Legislature was concerned with preserving a stabilized industry which would insure a proper and sufficient supply of wholesome milk for consumers and a fair price to producers and farmers. The act was therefore extended beyond its June 30, 1937 expiration date to June 30, 1939, by *L.* 1937, *c.* 56, § 7.

A new act was passed in 1939. The preamble of *L.* 1939, *c.* 82 repeats the legislative concern for the economic welfare

of milk producers. That act was to expire June 30, 1941. By *L*. 1941, *c*. 274, the Legislature enacted the Milk Control Act now on the statute books, *N. J. S. A*. 4:12A–1 *et seq.*, to continue until such date as the Legislature determined that an emergency no longer existed. The preamble to the 1941 act again demonstrated a continuing concern for the producer. The Legislature sought to avoid the possible "demoralization of the agricultural interests of this State engaged in the production of milk and the creation of conditions inimical to the health of the public of this State." The policy and intent of the act was stated as being "to prevent these unfair, unjust, destructive and demoralizing practices by providing a reasonable return for the milk producer, so as to prevent possible curtailment of a sufficient supply of fresh, wholesome, sanitary milk for our citizens."

Milk control, therefore, presently and for many years has had as one of its main purposes the preservation of the economic welfare of milk producers. As the *alter ego* of its producer-members, Cooperative seeks to strengthen the announced legislative purpose. Indeed, the underlying concept of a cooperative formed under the Agricultural Cooperative Associations Act, *N. J. S. A*. 4:13–1 *et seq.*, is to give producers collectively—here, milk producers—bargaining power in dealing with milk dealers. To designate Cooperative as a "milk dealer" is to belie the essential purpose for its organization and existence. It cannot be a "milk dealer" and still be the spokesman and champion of producers in their frequently conflicting business relationships with milk dealers. To so hold would, as Cooperative argues, pervert and in substantial measure destroy the agricultural cooperative program supported as part of New Jersey's public policy.

It is appropriate to refer, as *in pari materia,* to *N. J. S. A*. 4:12–1 *et seq.*, the law dealing with the receiving, buying, testing, sampling and weighing of milk and cream. The definition section of that act, *N. J. S. A*. 4:12–1, contains the following definitions:

220

" 'Dealer' means any person engaged in the business of buying or receiving milk or cream from a producer of this State for the purpose of shipping or for sale, resale or manufacture.

'Producer' means any person engaged in the business of producing milk or cream in this State and any *agricultural cooperative association organized pursuant to the provisions of chapter 13 of this Title* [*N. J. S. A.* 4:13–1 *et seq.*]." (Italics ours)

Incidentally, *N. J. S. A.* 4:12–1 was amended by *L.* 1949, *c.* 249; *N. J. S. A.* 4:12A–1 *et seq.,* under which the Director acted, was enacted and became effective in 1941.

Under *N. J. S. A.* 4:12–1, Cooperative is clearly a "producer." The argument made on behalf of the Director is that *N. J. S. A.* 4:12–1 *et seq.* deals with the licensing and bonding of persons engaged in the milk business, and one of its obvious purposes is to protect the dairy farmer. That is so; the idea behind the act is to insure that producers be paid for the milk they supply to dairies. But it is equally true that a primary purpose of the Milk Control Act, *N. J. S. A.* 4:12A–1 *et seq.,* is to protect the producer, as our examination of the preamble to the present act and its predecessors demonstrates. We cannot escape the *in pari materia* application of the definition provisions of each act.

The Director, as we learn from the reasons set out in the agreed statement of facts, states three grounds for his determination that Cooperative is a milk dealer. The first ground is that Cooperative determines which dairy is to receive each producer's milk. But the marketing or selling of its members' dairy products falls squarely within the powers granted a cooperative under the Agricultural Cooperative Associations Act.

The second reason advanced is that Cooperative, in some instances, receives payment for the producer's milk. We fail to see how this makes Cooperative a milk dealer. All that it is doing in such instances is to provide a collection and distribution service for its members. It never holds title to or has possession of the milk, nor bottles, processes or transports it.

Finally, the third reason given, and one which echoes the letter determination of October 5, 1962, is that the Director "has always held that where the activities mentioned under the first and second reasons occur together," the cooperative is a milk dealer. The October 5 determination puts it more broadly: a "long-standing interpretation of the Milk Control Act to the effect that all cooperatives marketing milk must be licensed"—a statement which, in the factual setting of this case, flies in the face of *N. J. S. A.* 4:13–3 (a) referred to above. The Director does not tell us the basis of his "long-standing interpretation"—how many cooperatives have been involved since the passage of the 1941 Milk Control Act and just what their activities were. We consider the "long-standing interpretation" reason as unsatisfactory in the circumstances, not only because of the lack of specific citation of instances of such interpretation but, more fundamentally, because we consider Cooperative's activities, as agreed upon by the parties in their statement, as not bringing it within the definition of "milk dealer" and the legislative purpose sought to be achieved by the Milk Control Act.

Accordingly, the determination of the Director is reversed.